IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF WAUKEGAN, ILLINOIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07 C 5008 |
| ) | |
| NATIONAL GYPSUM CO.; BOMBARDIER ) | |
| MOTOR CORP. OF AMERICA; LAFARGE ) | |
| NORTH AMERICA, INC.; LAFARGE ) | |
| BUILDING MATERIALS INC., f/k/a BLUE ) | |
| CIRCLE, INC.; ST. MARY'S CEMENT, ) | |
| INC.; and WAUKEGAN PORT DISTRICT, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this action under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA) and the Illinois Water Pollutant Discharge Act (IWPDA), the City of Waukegan has sued several entities for damages and declaratory relief connected with contamination in Waukegan Harbor. In its amended complaint, Waukegan alleges that the harbor is contaminated with polychlorinated biphenyls (PCBs) that were discharged into and around the harbor by the now-defunct Outboard Marine Corp. (OMC), a marine products manufacturer. Am. Compl. ¶¶ 12-14. In the 1980's, the United States Environmental Protection Agency (USEPA) put the harbor and some of the surrounding land (the Site) on the National Priorities List (NPL), *id*. ¶ 15, the "list of national priorities among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States and its

territories." See http://www.epa.gov/superfund/sites/npl/ (visited Apr. 6, 2008). "The NPL is intended primarily to guide the EPA in determining which sites warrant further investigation." *Id.*

In 1992, OMC completed a remediation project that involved dredging, treating, and disposing of around a million pounds of PCB-contaminated sediments. Am. Compl. ¶ 16. In 2000, OMC closed its plants in the area of the harbor and filed for bankruptcy. *Id.* ¶ 17. Waukegan alleges that in 2002, it took title to a portion of the Site known as the Waukegan Coke Plant property, and that in 2005, it took title to another portion of the Site known as the OMC North Plant. *Id.* ¶ 18. Waukegan contends that despite the remediation, PCB contamination persists in harbor sediments at levels above the current regulatory limit. *Id.* ¶ 19.

Defendants National Gypsum Corp., Bombardier Motor Corp. of North America, LaFarge North America Inc., LaFarge Building Materials, Inc., and St. Mary's Cement, Inc. are entities with business operations adjacent to the harbor. *Id.* ¶¶ 5-9. Waukegan alleges the following as to National Gypsum, the LaFarge entities, and St. Mary's:

> as part of [defendants'] normal business operations, large deep draft cargo vessels have caused prop wash which have [sic] routinely disturbed, suspended redistributed PCB-contaminated sediments throughout the Harbor. Such disturbances have mixed sediments into the water column, disrupted the benthic zone, and influenced Harbor water quality, thus exacerbating the PCB contamination in the Harbor.

*Id.* ¶¶ 20-23.[1] Waukegan alleges the following as to Bombardier:

> a part of Bombardier's normal business operations, it operates a

---

[1] The benthic zone is the ecological region at the lowest level of a body of water, including the sediment surface and some sub-surface layers. See http://en.wikipedia.org/wiki/Benthic_zone (visited Apr. 7, 2008).

submerged engine testing facility. The propellers in the testing facility
have caused prop wash which have [sic] routinely disturbed, suspended
redistributed PCB-contaminated sediments throughout the Harbor. Such
disturbances have mixed sediments into the water column, disrupted the
benthic zone, and influenced Harbor water quality, thus exacerbating the
PCB contamination in the Harbor.

*Id.* ¶ 24. According to the amended complaint, the Waukegan Port District "is a special purpose unit of government created pursuant to the Waukegan Port District Act, 70 ILCS 1865/3, and [whose] territory includes portions of the Harbor." *Id.* ¶ 10.

Waukegan alleges that "[a]ll of the Defendants owned and/or operated land within the Facility at the time of disposal or where contaminants have come to be located." *Id.* ¶ 25. It alleges that disposal of PCBs, a hazardous substance, occurred during times when each defendant owned and/or operated the Facility;[2] there have been releases and threatened releases of those hazardous substances into the environment; and this has caused Waukegan to incur response costs within the meaning of CERCLA, including costs for design of a dredging project aimed at the removal of PCBs from the Harbor. *Id.* ¶¶ 30-34. Waukegan thus alleges that each of the defendants is jointly and severally liable to the city for those costs already incurred, and it also seeks a declaratory judgment of liability for future response costs. *Id.* ¶¶ 35-36. It seeks to recover these costs and obtain the requested declaratory judgment. Waukegan makes similar allegations in its IWPDA claim.

Each of the defendants has moved to dismiss Waukegan's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court

---

[2] Waukegan uses the term "Facility" to describe the Site and areas where hazardous substances have come to be located. Am. Compl. ¶ 11.

grants the motions of all defendants other than Bombardier but denies Bombardier's motion.

## Discussion

**A.    CERCLA claims**

Under section 107(a) of CERCLA, various categories of persons and entities are liable for "necessary costs of response" incurred by any other person or entity consistent with the "national contingency plan," a phrase defined by the statute to denote sites identified by the USEPA as requiring cleanup. *See* 42 U.S.C. § 9607(a); *id.* § 9601(31) (definition of "national contingency plan"). The categories of those liable include "the owner and operator of a vessel or a facility [and] any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ." *Id.* § 9607(a)(1) & (2). A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 9601(9). A "[r]elease" is defined in CERCLA to include, with exceptions irrelevant in this case, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." *Id.* § 9601(22).

In its amended complaint, Waukegan alleges that each of the defendants was an owner "and/or" an operator of the Site at relevant times, Am. Compl. ¶ 25, leaving it a bit ambiguous whether it contended that each defendant was potentially liable in both of

4

those capacities. In its response to the motions to dismiss, however, Waukegan has made it clear that it seeks to impose liability against each of the defendants as both owners and operators.

1. **Waukegan Port District**

    a. **Liability as owner**

The Port District argues that it is neither an owner nor an operator of the Site. With regard to ownership, the Port District contends that the site is owned either by the State of Illinois or by the City of Waukegan itself. Under the Illinois Municipal Code, a city like Waukegan has the power to acquire, build, and operate a harbor within its jurisdiction and in adjacent public waters. 65 ILCS 5/11-92-2. To this end, a separate provision of the Municipal Code states that "[a]ll right, title and interest of the State of Illinois in and to submerged lands, naturally and artificially made or reclaimed lands, both within the boundaries of the harbor and adjoining its outer or water side, are hereby vested in the city or village for harbor and other public purposes, and the same shall be under the jurisdiction of the city or village." *Id.* 11-92-5. There is some authority that can be read to suggest that to actually acquire title to such property from the State for purposes of operating a harbor, a municipality must adopt an appropriate ordinance as outlined in a separate provision of the Municipal Code. *See id.* 11-92-7; *Village of Gulfport v. Huebner*, 114 Ill. App. 3d 1, 8-9, 251 N.E.2d 905, 908-09 (1969). The Court has no information at present regarding whether Waukegan has adopted such an ordinance. The Port District argues, however, that this is of no consequence; if the submerged lands under the harbor are not owned by Waukegan, they are still

owned by the State of Illinois. Either way, the Port District contends, *it* is not an owner of this property.

In response, Waukegan relies on the Waukegan Port District Act (WPDA), in which the Illinois legislature created the Port District as a municipal corporation embracing a portion of the territory that lies within the Site. 70 ILCS 1865/3. The WPDA provides that the Port District has certain enumerated rights and powers, including the powers to issue construction and excavation permits for work in and near the harbor; remove obstructions in navigable waters; establish dock lines and shore lines; regulate anchorage, moorage, and speed of waterborne vessels and regulate bridge operations; build and operate terminal and port facilities; lease "areas within the lands held by it or acquired by it" to private parties for development; establish and operate airport facilities within its corporate limits; and to "[p]olice its property and exercise police powers in respect thereto." *Id.* 1865/4.1 - 4.15. The WPDA also provides that the provisions of the Illinois Municipal Code "shall not be effective within the area of the [Port] District insofar as the provisions of said Acts conflict with the provisions of this Act or grant substantially the same powers to any municipal corporation or political subdivision as are granted to the District by this Act." *Id.* 1865/31.

With regard to the question of ownership, Waukegan relies largely on the WPDA's provision permitting the Port District to lease property within its jurisdiction to others. How, Waukegan argues, could the Port District possibly lease property that it does not own? Though this argument has some surface appeal, it does not carry the day. Absent some legally effective conveyance of the submerged land within

6

Waukegan Harbor by the State of Illinois, the State is the owner of that land. *Illinois Central R.R. Co. v. State of Illinois*, 146 U.S. 387, 435 (1892) ("It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found . . . ."); *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill. 2d 65, 72-73, 360 N.E.2d 773, 777 (1976). If the previously-referenced provision of the Illinois Municipal Code vesting title to submerged lands within a harbor to the adjoining municipality is self-executing, then Waukegan owns the submerged land in Waukegan Harbor; if that provision is not self-executing, the State of Illinois still owns the land. Either way, title was not conveyed to the Port District.

The fact that the Port District has been granted the authority to lease to others property within its jurisdiction is not, contrary to Waukegan's argument, inconsistent with the notion that someone else (either the State or Waukegan) owns that property. It is not in the least bit difficult to imagine a scenario in which the State legislature would determine that it makes sense to give a specially-created and specialized municipality like the Port District the right to lease lands within its jurisdiction even if ownership of those lands has been granted to some other municipality like Waukegan. In any event, nothing in the WPDA says that ownership of the land within the Port District's jurisdiction, submerged or otherwise, has been conveyed to the Port District.[3] For these

---

[3] Waukegan also relies on section 3 of the WPDA, which, according to Waukegan, "defines the territorial extent of the Port District's property" to include the submerged lands at issue. Pl. Resp. to Mots. to Dismiss at 9. Section 3, however, does not confer title or ownership of those lands on the Port District; rather it simply defines the extent of the Port District's jurisdiction. *See* 70 ILCS 1865/3.

7

reasons, the Court concludes that the Port District is not an "owner" of the submerged land under Waukegan Harbor for purposes of CERCLA liability.

### b. Liability as operator

Waukegan also argues that the Port District is an operator of the Harbor. In this regard, Waukegan relies on the fact that the Port District has the authority to, among other things, "[r]egulate the anchorage, moorage and speed of waterborne vessels" within the Harbor, 70 ILCS 1865/4.4 – including, obviously, the deep-draft vessels that Waukegan contends have caused the displacement of contaminants within the Harbor.

Though there is no question that the Port District has the legal authority to regulate shipping and boating traffic within the harbor, that is insufficient without more to make it an operator under CERCLA section 107(a). Under section 107(a), an operator is "someone who directs the workings of, manages, or conducts the affairs of a facility" – specifically, someone who manages, directs, or conducts operations that are related to the alleged release of hazardous waste or decisions about compliance with environmental regulations. *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). Mere oversight is insufficient. *See id.* at 71-72.

The parties have cited several pre-*Bestfoods* cases concerning whether governmental entities may be subject to operator liability under the statute. Each of these cases appears to the Court to be consistent with *Bestfoods* and thus still viable as legal authority. In *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir. 1995), the court considered whether the federal government could be considered an "operator" of a manufacturing facility owned by an entity with which the government had

contracted to produce a chemical defoliant. The court agreed with the standard established in a Third Circuit decision, also dealing with the government's potential liability as an operator, to the effect that "operator liability may result from actual or substantial control exercised by one entity over the activities of another." *Id.* at 808 (citing *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 843-45 (3d Cir. 1994) (en banc)). "Actual control," the court concluded, means substantial control over the allegedly-polluting activities, which in turn requires "'active involvement in [those] activities.'" *Id.* (quoting *FMC*, 29 F.3d at 843). Because the government had not been involved in or exerted substantial control over operations at the manufacturing facility, it could not be considered an operator of that facility. *Id.* at 809. In this regard, the court said, the fact that the facility was required to comply with government-imposed health and safety regulations, and had been subjected to compliance inspections regarding those regulations, was insufficient. *Id.*

For this latter point, the court in *Vertac* relied on the Fourth Circuit's decision in *United States v. Dart Indus., Inc.*, 847 F.2d 144 (4th Cir. 1988). In *Dart*, the court ruled that a state's environmental regulatory agency was not subject to CERCLA liability as an operator of a hazardous waste site that it regulated. The court reasoned that the fact that the state agency approved and disapproved applications to store wastes at the site, inspected the site, and required proper transportation of waste delivered there was insufficient to make it an operator, in absence of any allegation that the agency "went beyond this governmental supervision and directly managed [the facility owner's] employees or finances at the . . . site." *Id.* at 146. Though, under *Bestfoods*,

9

management of employees and/or finances may not be required to make a person or entity an operator of a facility for purposes of CERCLA liability, *Dart* makes it clear that possession of regulatory authority, without more, is insufficient. The court stated that

> [t]he generators are unable to specify any "hands on" activities by [the state agency] that contributed to the release of hazardous wastes. The district court appropriately described [the state agency's] activities as merely "a series of regulatory actions." . . . This court does not dispute that [the state agency] may have inadequately enforced the state environmental regulations. However, such unfortunate deficiencies do not constitute ownership or control as defined in § 9601; thus [the state agency] is not liable as an owner or operator under § 9607.

*Id.*

Waukegan relies on the Sixth Circuit's decision in *United States v. Twp. of Brighton*, 153 F.3d 307 (6th Cir. 1998), a post-*Bestfoods* decision, which Waukegan says supports the imposition of operator liability on the Port District. In that case, the court considered the imposition of CERCLA liability upon a governmental entity – a township – that had used a waste disposal facility. The plurality opinion for the court discussed both *FMC* and *Dart*, describing those cases and the question posed in the case at hand as follows:

> In . . . *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833 (3rd Cir. 1994) (en banc), the Third Circuit held that "the government [here, the federal government] can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility . . . even though no private party could engage in the regulatory activities at issue." *Id.* at 840. Thus, a government entity, by regulating the operation of a facility actively and extensively enough, can itself become an operator. *Cf. United States v. Dart Indus.*, 847 F.2d 144, 146 (4th Cir. 1988) (declining to classify local government as operator merely for failing to regulate adequately). *Our task is to distinguish (1) situations in which a governing authority uses its conventional police power to ensure that a dump does not pose a threat to public health and safety; from (2) situations in which the "regulations" are just the government's method of micromanaging the facility.*

*Id.* at 315 (emphasis added). In short, the court concluded that "mere regulation does not suffice to render a government entity liable, but actual operation (or 'micromanagement') does." *Id.* at 316. It remanded the case to the district court for application of that standard. The concurring judge largely agreed with the plurality decision in this respect, stating that

> [a] governmental entity becomes an operator under CERCLA where it not only possesses the authority to control the facility in question, but also exercises "actual control." Broadly speaking, any governmental entity has the "authority" to exert control over a facility by virtue of its regulatory powers. Thus, requiring only the "authority to control" could lead to the rather sweeping result that all governmental entities are "operators" over hazardous waste facilities located within their jurisdiction. In contrast, the "actual control" standard requires at least some affirmative conduct on the part of the governmental entity.

*Id.* at 325 (Moore, J., concurring in the result).

There is nothing in Waukegan's amended complaint to suggest that the Port District engaged in any sort of active management of the movement of ships within the harbor or of the type of shipping traffic alleged to have caused the releases at issue, or that it otherwise "micromanaged" the facility. *See id.* at 315. The Court therefore agrees with the Port District that Waukegan's reliance on the powers conferred by the WPDA is insufficient to sustain a claim that the Port District was an operator under CERCLA section 107(a). For these reasons, the Court dismisses Waukegan's CERCLA claims against the Port District to the extent it relies on a contention that the District was an operator of the Site.

### 2. Other defendants

Waukegan alleges that defendants National Gypsum Co., Bombardier Motor

11

Corp. of North America, LaFarge North America, Inc., LaFarge Building Materials, Inc., and St. Mary's Cement, Inc. (collectively, the private defendants) are liable under CERCLA both as "owners" and "operators." The Court will begin with the claim of "owner" liability.

### a. Liability as owners

Waukegan alleges that it now owns part of the Site, specifically the Waukegan Coke Plant and the OMC North Plant. *See* Am. Compl. ¶ 18. As discussed in the previous section of this decision, Waukegan also alleges that the Port District owns the submerged lands, but the Court has rejected that allegation on legal grounds. As to the remaining defendants, Waukegan alleges generally that all of them "owned and/or operated land within the Facility at the time of disposal or where contaminants have come to be located." *Id.* ¶ 25.

In light of the Court's conclusion that either Waukegan itself or the State of Illinois owns the lands submerged beneath the harbor, the allegation in paragraph 25 of the amended complaint is far too general and non-specific to serve as the basis for a claim of ownership liability against the private defendants. The key reason for this is that CERCLA imposes "owner" liability upon the owner of a facility from which there is a release or threatened release of a hazardous substance, and upon anyone who owned, at the time of the disposal of any hazardous substance, a facility from which there is such a release or threatened release. 42 U.S.C. § 9607(a)(1) & (2). Waukegan's allegations regarding a release or threatened release of a hazardous substance all focus upon the Harbor itself; Waukegan alleges that various activities have "disturbed suspended redistributed PCB-contaminated sediments throughout the Harbor," and that

this has "mixed sediments into the water column, disrupted the benthic zone, and influenced Harbor water quality, thus exacerbating the PCB contamination in the Harbor." Am. Compl. ¶¶ 20-25. In short, there is no allegation that these activities have caused PCBs or other hazardous substances to be deposited *outside* the Harbor or that any hazardous substances previously deposited outside the Harbor have been disturbed or otherwise released; the alleged releases all concern movement and redistribution of substances *within* the Harbor. The amended complaint provides no basis for a claim that any of the defendants own, or ever owned, any part of the Harbor itself.

### b. Liability as operators

The next issue concerns the private defendants' potential "operator" liability under CERCLA. The Court first will address the contention that National Gypsum, the LaFarge defendants, and St. Mary's each is liable because, as part of their regular operations, each caused to travel through the Harbor vessels that disturbed the contaminated sediments, causing what Waukegan contends are releases or threatened releases within the meaning of CERCLA. The parties dispute whether this is a sufficient basis for operator liability.

The precise question at issue in this case has not been addressed by any court, as best as this Court can determine. The Supreme Court did, however, address the scope of operator liability in *Bestfoods*. *Bestfoods* involved an attempt to impose CERCLA "operator" liability on the parent of the defunct entities that had owned and operated the site. The Court said CERCLA does not undercut the basic principle of

corporate law that a parent is not, by reason of that status alone, liable for a subsidiary's acts, but that a parent may be held liable if, under state law, the corporate veil may be pierced in the particular situation. *Bestfoods*, 524 U.S. at 62-63. The government also argued, however, that the parent could be said to have operated the facility via its involvement in the activities of the subsidiary entities. The Court noted that under section 9607(a)(2), any person who operates a polluting facility is liable for cleanup costs. This is so, the Court said, "regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." *Id.* at 65. If any such act is done on behalf of a parent corporation, the Court stated, state corporate law would be irrelevant to the issue of direct liability – because the parent could be said to have operated the facility itself. *Id.*

The Court went on to discuss the meaning of the statutory term "operator." It said the term has the meaning it is commonly understood to have in the organizational sense – "'[t]o conduct the affairs of; manage; operate a business.'" *Id.* at 66 (quoting American Heritage Dictionary 1707 (3d ed. 1992)). As a result, the Court stated, "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67.

"In our enquiry into the meaning Congress presumably had in mind when it used

14

the verb 'to operate,' we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. Mere oversight of a subsidiary, the Court stated, is insufficient to subject a parent to liability for the subsidiary's activities. *Id.* at 71-72.

Though Waukegan alleges that each of the private defendants caused vessels to come into the Harbor in connection with the defendants' normal business operations, nothing in the amended complaint suggests that any of the defendants exercised any direction over any aspect of these shipping activities claimed to have caused the releases at issue in this case – specifically, the use of "deep-draft" vessels that caused the PCB-contaminated sediments on the Harbor floor to be stirred up and redistributed. Specifically, Waukegan does not allege that any of the private defendants exercised any direction over what vessels would be used or how they would traverse the harbor, or that it managed or otherwise conducted those activities.

The entities that owned the vessels that traversed the Harbor conceivably could be said to have conducted the activities in the Harbor that caused the alleged releases, and thus to be operators of the Harbor with respect to those activities. An independent contractor like the vessel owners is not liable as an operator if it lacks control over the pollution-creating operations, *see generally Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157-59 (7th Cir. 1988), but a contractor may be liable as an operator if it had the authority to control the cause of the contamination at the time of the release of hazardous substances. *See Kaiser Aluminum & Chem. Corp. v. Catellus*

15

*Devel. Corp.*, 976 F.2d 1338, 1341-42 (9th Cir. 1992) (discussing *Edward Hines Lumber*; citing *Nurad, Inc. v. Hooper & Sons Co.*, 966 F.2d 837, 942 (4th Cir. 1992) and *CPC Int'l, Inc. v. Aerojet-General Corp.*, 731 F. Supp. 783, 788 (E.D. Mich. 1989)). *See also, Ganton Techs., Inc. v. Quadion Corp.*, 834 F. Supp. 1018, 1022 (N.D. Ill. 1993) (pollution clean-up contractor claimed to have made pollution worse could be sued as operator of site; relying on *Kaiser Aluminum*). The fact that the Harbor may be run or managed by others does not eliminate the possibility that someone in the position of a vessel owner can be an operator for purposes of CERCLA. In this regard, the Supreme Court's saboteur example in *Bestfoods* is instructive: the Court, in discussing the scope of operator liability, indicated that "a saboteur who sneaks into the facility at night to discharge its poisons out of malice" could be sued as an operator of the facility. *Bestfoods*, 524 U.S. at 65.

One might wonder why, if the vessel owners could be said to be operators, the private defendants, who caused the vessel owners to come through the Harbor, ought not be liable for having hired them. The Court believes, however, that CERCLA does not undercut the principle that one who hires an independent contractor is not, without more, liable for the contractor's torts, just as (as *Bestfoods* holds) it does not undercut the principle that a parent is not, without more, liable for its subsidiary's torts. *Cf. Edward Hines Lumber*, 861 F.2d at 157 (noting the common law principle that an employer of an independent contractor is not liable for the contractor's torts); Restatement (2d) of Torts § 409 (same).

For these reasons, the Court dismisses Waukegan's "operator" claims against

the private defendants to the extent they are premised upon allegations that those defendants caused vessels to traverse the harbor.

Waukegan makes a separate allegation regarding operator liability aimed only at Bombardier. Waukegan alleges that "as part of Bombardier's normal business operations, it operates a submerged engine testing facility. The propellers in the testing facility have caused prop wash which have [sic] routinely disturbed, suspended redistributed PCB-contaminated sediments throughout the Harbor." Am. Compl. ¶ 24. This, Waukegan alleges, has mixed the sediments into the water column, disrupted the benthic zone, and influenced water quality, thus exacerbating the PCB contamination in the Harbor. *Id.*

Waukegan's allegations are sufficient to state a claim for operator liability against Bombardier. In contrast to the other defendants, Bombardier is alleged to have, in the words of *Bestfoods*, "conducted operations" in the Harbor "specifically related to pollution, that is, operations having to do with the leakage . . . of hazardous waste." *Bestfoods*, 524 U.S. at 66-67. The Court likewise concludes that Waukegan has sufficiently alleged that Bombardier's operation of the Harbor caused a "release" of hazardous substances, a term defined in CERCLA to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). Finally, Waukegan has sufficiently alleged that the releases have caused it to incur necessary "response costs" consistent with the national contingency plan; it asserts, in the amended complaint, that it has been required to incur "costs for design of a dredging project aimed at the removal of PCBs in the Harbor." Am. Compl. ¶ 44. *See, e.g., Soo Line R.*

17

*Co. v. Tang Inds., Inc.*, 998 F. Supp. 889, 895 (N.D. Ill. 1998) (costs paid to evaluate a site and develop a plan for remedial action are "response costs" under CERCLA).

**2.    IWPDA claims**

The IWPDA prohibits the "discharge" of oil or "other pollutants" directly or indirectly into the waters of Illinois and authorizes any governmental body having such waters within its territorial limits to arrange for the pollutants' removal. 415 ILCS 25/3, 4. "'Discharge' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping," and the term "other pollutants" is defined to mean "any floating materials which may cause unsightly appearance on the surface of such waters or are detrimental to aquatic life or the water quality of such waters" *Id.* 25/2(b)-(c). Under the statute, "[t]he owner or operator of such facility from which oil or other pollutants are discharged in violation of Section 3 of this act, shall be liable to such governmental body for the actual costs incurred for the removal of such oil or other pollutants." *Id.* 25/5.

The statutory definition of the term "owner or operator," like that contained in CERCLA, is not particularly illuminating; the IWPDA says that this term "means any person owning or operating any facility." *Id.* 25/2(h). But there is no basis to believe that this term has a meaning that differs from that which applies under CERCLA. As a result, for the reasons described earlier, the Court concludes that Waukegan has failed to state a claim against any defendant other than Bombardier under the IWPDA. The allegations regarding Bombardier's underwater propellor testing facility, however, suffice to describe Bombardier as an operator of the Site.

Bombardier also argues that Waukegan has failed to allege that there was a discharge of other pollutants into Illinois waters, as required under section 5 of the IWPDA. The Court disagrees. First, PCB contamination stirred up within the water in the Harbor unquestionably qualifies as "floating materials . . . detrimental to aquatic life or the water quality" of the Harbor. *Id.* 25/2(b). Second, the statutory definition of "discharge" is deliberately broad and must be read in a way that is consonant with the statutory purpose of preventing pollution discharges into water used for (among other things) recreational or navigational purposes, *see id.* 25/1; the gist of Waukegan's claim is that the PCB contamination was in sediment on the floor of the Harbor and was stirred up into the water by Bombardier's testing activities. Finally, for the same reason, the Court disagrees with Bombardier's contention that Waukegan has alleged a discharge "into" the water; Waukegan contends that Bombardier's activities moved the PCB contamination from one place to another within the Harbor.

## Conclusion

For the reasons stated above, the Court grants the motions to dismiss filed by defendants National Gypsum Co., LaFarge North America, Inc., LaFarge Building Materials, Inc., St. Mary's Cement, Inc., and the Waukegan Port District [docket nos. 49, 51, 56, 59]. The Court denies the motion to dismiss filed by defendant Bombardier Motor Corp. of America [docket no. 54] on the ground that plaintiff may maintain a claim against Bombardier for "operator" liability under CERCLA and the IWPDA. Bombardier

19

is directed to answer the amended complaint within fourteen days of the date of this decision.

_____
   MATTHEW F. KENNELLY
   United States District Judge

Date: April 7, 2008