**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CITY OF WAUKEGAN, ILLINOIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 5008** |
| | ) | |
| **NATIONAL GYPSUM CO.; BOMBARDIER** | ) | |
| **MOTOR CORP. OF AMERICA; LAFARGE** | ) | |
| **NORTH AMERICA, INC.; LAFARGE** | ) | |
| **BUILDING MATERIALS INC., f/k/a BLUE** | ) | |
| **CIRCLE, INC.; ST. MARY'S CEMENT,** | ) | |
| **INC.; and WAUKEGAN PORT DISTRICT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In this action under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA) and the Illinois Water Pollutant Discharge Act (IWPDA), the City of Waukegan (Waukegan) has sued several entities for damages and declaratory relief connected with contamination in Waukegan Harbor. National Gypsum Co. (National Gypsum), LaFarge North America, Inc. (LaFarge), LaFarge Building Materials, Inc. (LBM and, collectively with LaFarge, the LaFarge Defendants), and St. Mary's Cement, Inc. (St. Mary's) have jointly moved to dismiss all of Waukegan's claims and have also filed individual motions to dismiss.[1]

---

[1]Waukegan Port District (the Port District) joined the common motion to dismiss, and also made an individual motion to dismiss. After those motions were filed, Waukegan voluntarily dismissed its claims against the Port District pursuant to Federal Rule of Civil Procedure 41.

The Court previously granted the joint motion to dismiss on the ground that Waukegan's complaint was time-barred. *City of Waukegan v. Nat'l Gypsum Co.*, No. 07 C 5008, 2008 WL 4201680 (N.D. Ill. Sept. 8, 2008). The Court later vacated that ruling on Waukegan's motion for reconsideration, concluding that given the standard applicable on a motion to dismiss, the Court could not definitively determine – as it had in its original ruling – that Waukegan's CERCLA claim sought only to recover response costs relating to a "remedial action" as CERCLA defines that term.

The Court therefore turns to the remaining grounds for dismissal cited by the defendants. For the reasons set forth below, the Court grants in part and denies in part the common motion to dismiss and the LaFarge Defendants' motion to dismiss; denies National Gypsum's motion to dismiss; and grants St. Mary's motion to dismiss.

## Factual Background

When considering a motion to dismiss, the Court accepts as true the complaint's factual allegations and draws reasonable inferences in favor of the plaintiff. *See, e.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 617 (7th Cir. 2007). The Court treats exhibits to a complaint as part of the complaint. Fed. R. Civ. P. 10(c). The Court is not bound by Waukegan's characterizations of the exhibits attached to its complaint and can independently examine those exhibits for inconsistencies between them and Waukegan's allegations.[2] *See, e.g.*, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002); *Rosenblum v. Travelbyus.com, Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

---

[2]Unless otherwise specified, references to the complaint in this opinion mean Waukegan's second amended complaint.

2

In its complaint, Waukegan alleges that the harbor is contaminated with polychlorinated biphenyls (PCBs) that were discharged into and around the harbor by the now-defunct Outboard Marine Corp. (OMC), a marine products manufacturer. Substantial quantities of PCBs are present in the sediment located on submerged lands throughout the harbor. In the 1980's, the United States Environmental Protection Agency (USEPA) put the harbor and some of the surrounding land on the National Priorities List (NPL). "The NPL is intended primarily to guide the EPA in determining which sites warrant further investigation." *See* http://www.epa.gov/superfund/sites/npl/ (visited Nov. 14, 2008). Waukegan's claims against the defendants in this case encompass a portion of the NPL site in and around portions of the harbor (the Facility). In 1992, OMC completed a remediation project that involved dredging, treating, and disposing of around a million pounds of PCB-contaminated sediments. Despite these efforts, sediments in portions of the harbor are still contaminated with PCBs above the regulatory limit of one part per one million. In 2000, OMC closed its plants in the area of the harbor and filed for bankruptcy.

National Gypsum, the LaFarge Defendants, and St. Mary's are entities with business operations adjacent to or near the harbor. Each utilizes the harbor as part of those operations. In its complaint, Waukegan traces the ownership of the land around and underneath the harbor back to 1846, when it was purchased by John Lewis. At that time, portions of the harbor that are submerged today were dry land and were part of what Lewis purchased. The shoreline that constituted the eastern boundary of Lewis' property along Lake Michigan was extended eastward over time. The harbor, as it exists today, was subsequently created when, on several occasions, certain portions

of Lewis' land were excavated and dredged.

Waukegan alleges that following various transfers over time, title to portions of Lewis' land came to reside with the Elgin, Joliet & Eastern Railway Company (EJ&E) and the Port District. EJ&E and the Port District subsequently entered into long-term leases of land bordering or located near the harbor with National Gypsum, the LaFarge Defendants, and St. Mary's. The particulars of each of those leases are discussed in further detail below.

Waukegan alleges that conduct by the defendants has exacerbated the PCB-contamination problem in the Facility. Waukegan alleges that National Gypsum, the LaFarge Defendants, and St. Mary's operate docking and mooring facilities in the harbor, maintain portions of the harbor, and have arranged for "large deep draft cargo vessels" to traverse and dock in the harbor. 2d Am. Compl. ¶ 78. Those vessels allegedly "generate prop wash that disturbs, suspends and redistributes PCB-contaminated sediments throughout the Harbor. Such disturbances have mixed sediments into the water column, disrupted the benthic zone, and influenced Harbor water quality, thus exacerbating the PCB contamination in the Harbor." *Id.* ¶ 79. Waukegan also claims that National Gypsum and LaFarge own some of the vessels that have engaged in this activity. Additionally, Waukegan alleges that National Gypsum maintains submerged lands that are part of its leased premises. In or around 2000, a portion of the harbor was dredged following a request to do so by National Gypsum, LBM, and LaFarge. That dredging allegedly "caused PCB contaminated sediment to escape . . . during the dredging process, resulting in the disturbance, suspension and redistribution of PCB-contaminated sediments in the Harbor." *Id.* ¶ 76.

As a result of the PCB-contamination present in the Facility and due to defendants' alleged conduct, Waukegan says, it "has incurred, and will continue to incur, response costs in connection with the investigation of the PCBs at the Facility and potential remedial actions . . . within the meaning and scope of CERCLA." *Id.* ¶¶ 94-95. Waukegan makes similar claims under the IWPDA.

## Discussion

The Seventh Circuit has emphasized that, even after the Supreme Court's ruling in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), federal courts continue to adhere to a notice pleading standard. *E.g.*, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083-84 (7th Cir. 2008). "A plaintiff must still provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests . . . ." *Id.* at 1083 (quotation omitted). "CERCLA does not contain any heightened pleading requirements." *City of Waco v. Schouten*, 385 F. Supp. 2d 595, 600 (W.D. Tex. 2005).

## 1. CERCLA claims

Under section 107(a) of CERCLA, various categories of persons and entities are liable for "necessary costs of response" incurred by any other person or entity consistent with the "national contingency plan," a phrase defined by the statute to denote sites identified by the USEPA as requiring cleanup. *See* 42 U.S.C. §§ 9607(a), 9601(31). The categories of those liable include "the owner and operator of a vessel or a facility [and] any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed

of . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ." *Id.* § 9607(a)(1)-(2). A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 9601(9). A "[r]elease" is defined in CERCLA to include, with exceptions irrelevant in this case, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." *Id.* § 9601(22).

The motions to dismiss do not challenge whether the Facility, as alleged in the complaint, is a "facility" for purposes of CERCLA or that "releases" have occurred. Instead, National Gypsum, the LaFarge Defendants, and St. Mary's argue that Waukegan has not sufficiently alleged that they were owners or operators within the meaning of CERCLA. They also contend that Waukegan has not alleged the requisite causation.

### a.    National Gypsum

Waukegan alleges that National Gypsum is liable under CERCLA both as an owner and as an operator. As set forth below, Waukegan has stated a viable claim in each of these respects.

### i.    Owner liability

In 1956, part of the land in the area of the harbor owned by EJ&E was leased to National Gypsum's predecessor, also called National Gypsum Company (Old Gypsum). Old Gypsum received a discharge in bankruptcy in 1993, at which time it assigned to National Gypsum its rights and interests in the lease with EJ&E. That lease was for a

term of seventy years.  The lease allegedly included portions of the original property owned by Lewis, subsequently acquired by EJ&E, that are now submerged and form part of the Facility.  The lease also required National Gypsum to pay taxes on the property, permitted assignment and subletting, allowed National Gypsum to make changes and improvements to the leased property – including "lands under water leading to and adjoining such boundaries" – and required National Gypsum to maintain the leased property at its own expense.  National Gypsum does not contest that a lessee with these rights and obligations can be considered an owner for purposes of section 107(a) of CERCLA.  *See, e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 328 (2d Cir. 2000); *Burlington N. R. Co. v. Woods Indus., Inc.*, 815 F. Supp. 1384, 1391 (E.D. Wash. 1993).

National Gypsum contends, in the common motion, that it is not subject to owner liability under CERCLA because it is not the owner of a portion of the Facility.  National Gypsum argues that the actual owner of that property is the State of Illinois because the area in question is submerged under water in the harbor.  To make this argument, National Gypsum relies primarily on *Illinois Central R. Co. v. Illinois*, 146 U.S. 387 (1892).  In that case, the Supreme Court stated:  "It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found. . . ."  *Id.* at 435.  This rule applies to "lands under the navigable waters of the Great Lakes."  *Id.* at 437.  Based on this authority, the Court dismissed the ownership claims against National Gypsum contained in Waukegan's amended complaint.  *City of*

*Waukegan v. Nat'l Gypsum Co.*, 560 F. Supp. 2d 636, 640, 643-44 (N.D. Ill. 2008).  The amended complaint contained only a very general allegation that National Gypsum "owned and/or operated land within the Facility at the time of disposal or where contaminants have come to be located."  *Id.* at 643.

By contrast, the second amended complaint contains much more specific allegations regarding National Gypsum's alleged ownership of part of the Facility, as detailed above.  Importantly, the second amended complaint also adds allegations concerning the submerged lands in the harbor.  These lands, which are part of the Facility, were allegedly part of the property owned by Lewis that was subsequently conveyed to EJ&E and leased to National Gypsum.  According to the complaint, these lands were not slowly submerged over time; rather, they were subject to sudden flooding and submersion due to excavation and other activities.  Based on these allegations, Waukegan argues that the submersion of the lands underneath the harbor resulted from avulsions and that ownership of those lands remains with private parties, not the State of Illinois.

An owner of real property bordering on the water's edge acquires "title to any land which might be added by accretions" and loses title to any land washed away by the water slowly over time.  *Schulte v. Warren*, 218 Ill. 108, 118, 75 N.E. 783, 785 (1905).  By contrast, "[w]here there is a sudden or marked change in the shore line and the lands of the adjoining owner are flooded or the course of a stream changed, the adjoining owner is not thereby divested of his title."  *Id.* (finding landowner did not lose title to property that became submerged after construction of a dam and lock altered the course of a river).  Such a loss of land is called an avulsion.  "An avulsion, it is settled,

8

does not change the boundary line" of property. *Wall v. Chicago Park Dist.*, 378 Ill. 81, 97, 37 N.E.2d 752, 760 (1941); *see also Comm'rs of Lincoln Park v. Fahrney*, 250 Ill. 256, 265-66, 95 N.E. 194, 198 (1911). Defendants' attempt to distinguish *Schulte* misses the mark. Even though that case involved a different factual scenario, the general principles regarding avulsion announced by the Illinois Supreme Court in *Schulte* and the other Illinois cases cited are clear. The doctrine of avulsion is generally accepted as part of the common law throughout the United States. *See New Jersey v. New York*, 523 U.S. 767, 784 (1998). The same rules apply both to natural avulsions (e.g., a sudden storm or flood) and artificial avulsions (e.g., excavation along waterfront property). *E.g.*, *J.P. Furlong Enters., Inc. v. Sun Exploration & Prod. Co.*, 423 N.W.2d 130, 134 (N.D. 1988); *Cinque Bambini P'ship v. State*, 491 So. 2d 508, 520 (Miss. 1986).

The complaint alleges that the submerged land in the harbor is part of the Facility, has been leased to National Gypsum, and became submerged by sudden acts of excavation that occurred to create the harbor. Avulsive changes to the shoreline would not divest EJ&E or its lessee, National Gypsum, of their property rights. These allegations are sufficient to state a claim for owner liability against National Gypsum under CERCLA. If proven, Waukegan's allegations would render National Gypsum the owner of some of the submerged lands in the Facility.

National Gypsum argues that, even if an avulsion has been pleaded, the State is still the owner of the submerged lands because the requisite period for prescriptive rights has passed. *See* 735 ILCS 5/13-101 (prescription period in Illinois is twenty

years).  To support this argument, National Gypsum cites two cases holding that when artificially avulsed land is submerged for the entire prescriptive period, title to the submerged lands transfers to the state.  *See State v. Hatchie Coon Hunting & Fishing Club, Inc.*, --- S.W.3d ---, 2008 WL 598143, at *3-4 (Ark. Mar. 6, 2008); *State v. Superior Court of Placer County*, 29 Cal. 3d 240, 248-49, 625 P.2d 256, 261 (1981).  In both the Arkansas and California cases, several justices dissented.  The parties do not cite any Illinois authority adopting this change from the ordinary rule of avulsion; indeed, the Illinois Supreme Court in *Schulte* expressly declined to address the issue of prescriptive rights.  *Schulte*, 218 Ill. at 117, 75 N.E. at 784.  This variance from the usual rule of avulsion has not been widely addressed; several courts, however, have found no such change.  *See Town of Hempstead v. Little*, 20 A.D.2d 539, 540, 245 N.Y.S.2d  407, 409 (1963) (holding title to avulsed land remained with original owner "regardless of the intervening length of time"); *Kansas v. Meriwether*, 182 F. 457, 460 (8th Cir. 1910) (noting that following an avulsion, title to property would not inure to the state even after twenty years had passed).  Given the absence of any Illinois authority modifying the ordinary rule of avulsion and the lack of widespread authority in other states doing so, the Court declines to find that Illinois law contains the exception to the general rule of avulsion announced in the Arkansas and California cases cited by defendants.

Notably, in the Arkansas and California cases, the changes in the water lines affecting the property rights had occurred due to the actions of state officials; specifically, state agents erected and controlled dams or other instrumentalities that

affected the water level and submerged the lands in question. *Hatchie Coon Hunting & Fishing Club, Inc.*, --- S.W.3d at ---, 2008 WL 598143, at *1-2; *Superior Court of Placer County*, 29 Ill. 3d at 248-49, 625 P.2d at 261. Thus, in the cases cited by defendants, the states that gained title to submerged lands had actually engaged in open and notorious activity on the land of the former owners – flooding the lands. In Illinois, like most other jurisdictions, a party does not gain adverse possession simply through the passage of time; rather, it is necessary to prove hostile, open, and notorious use or possession of another's property for the entire prescriptive period. *E.g.*, *Stankewitz v. Boho*, 287 Ill. App. 3d 515, 518, 678 N.E.2d 1247, 1249 (1997). In this case, there has been no contention that the State of Illinois caused the avulsion or engaged in any other activity on the submerged lands in the harbor. Even if the prescriptive period has passed, the types of facts that ordinarily give rise to adverse possession are absent in this case. In the Court's view, passage of the prescriptive period, standing alone, does not alter the application of the doctrine of avulsion in this case so as to defeat Waukegan's claims.

Finally, National Gypsum complains of the "monumental evidentiary problem" in determining the shoreline of Lake Michigan from the mid-1800s through the current date. Common Mot. at 12. To the extent there is a problem, it is Waukegan's. Waukegan will have the burden to prove owner liability under CERCLA, and if Waukegan is unable to produce such evidence, defendants will be free to seek summary judgment. This is not, however, a reason to dismiss Waukegan's claim at the pleading stage. *See Burns v. Paddock*, 503 F.2d 18, 25 (7th Cir. 1974) ("Speculation

on the difficulties of proof should not . . . figure in the disposition of a motion to dismiss.").[3]

### ii.   Operator liability

Under section 107(a) of CERCLA, an operator is "someone who directs the workings of, manages, or conducts the affairs of a facility" – specifically, someone who manages, directs, or conducts operations that are related to the alleged release of hazardous waste or decisions about compliance with environmental regulations. *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). The Court discussed the *Bestfoods* decision at length in its April 7, 2008 opinion in this case. *See City of Waukegan*, 560 F. Supp. 2d at 644.

Waukegan identifies several different activities by National Gypsum as the basis for operator liability. The first involves prop wash from large vessels making deliveries to National Gypsum, which allegedly stirs up PCB-contaminated sediment in the harbor, thereby exacerbating the contamination in the Facility. This Court dismissed the prop wash operator claims in Waukegan's amended complaint because

> nothing in the amended complaint suggests that any of the defendants exercised any direction over any aspect of these shipping activities claimed to have caused the releases at issue in this case – specifically, the use of "deep-draft" vessels that caused the PCB-contaminated sediments on the harbor floor to be stirred up and redistributed. Specifically, Waukegan does not allege that any of the private defendants exercised any direction over what vessels would be used or how they

---

[3]National Gypsum argues that if the owner liability claims against it are not dismissed, additional parties, including the State of Illinois and EJ&E, are necessary parties that must be joined pursuant to Federal Rule of Civil Procedure 19. The Court expresses no opinion on this contention at this time because it has only been addressed in a cursory manner. To the extent defendants seek to join additional parties, they should file an appropriate motion fully framing the issue.

would traverse the Harbor, or that it managed or otherwise conducted those activities.

*Id.* at 645. Nothing in the second amended complaint affects this analysis.

Accordingly, the Court dismisses the operator claim against National Gypsum based on delivery of goods by deep draft vessels.

A closer question is the related allegation, made for the first time in the second amended complaint, that National Gypsum actually owns and operates some of the vessels that traverse the harbor. Though the document attached to the complaint in support of this proposition does not clearly support this allegation, that document does not refute it either. This Court considered the potential liability of vessel owners as operators in its April 2008, decision:

> The entities that owned the vessels that traversed the Harbor conceivably could be said to have conducted the activities in the Harbor that caused the alleged releases, and thus to be operators of the harbor with respect to those activities. An independent contractor like the vessel owners is not liable as an operator if it lacks control over the pollution-creating operations, *see generally Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157-59 (7th Cir. 1988), but a contractor may be liable as an operator if it had the authority to control the cause of the contamination at the time of the release of hazardous substances. *See Kaiser Aluminum & Chem. Corp. v. Catellus Devel. Corp.*, 976 F.2d 1338, 1341-42 (9th Cir. 1992) (discussing *Edward Hines Lumber*; citing *Nurad, Inc. v. Hooper & Sons Co.*, 966 F.2d 837, 942 (4th Cir. 1992) and *CPC Int'l, Inc. v. Aerojet-General Corp.*, 731 F. Supp. 783, 788 (E.D. Mich. 1989)). *See also, Ganton Techs., Inc. v. Quadion Corp.*, 834 F. Supp. 1018, 1022 (N.D. Ill. 1993) (pollution clean-up contractor claimed to have made pollution worse could be sued as operator of site; relying on *Kaiser Aluminum*). The fact that the Harbor may be run or managed by others does not eliminate the possibility that someone in the position of a vessel owner can be an operator for purposes of CERCLA. In this regard, the Supreme Court's saboteur example in *Bestfoods* is instructive: the Court, in discussing the scope of operator liability, indicated that "a saboteur who sneaks into the facility at night to discharge its poisons out of malice" could be sued as an operator of the facility. *Bestfoods*, 524 U.S. at 65.

*Id.* at 645. Operating a vessel that causes a release of hazardous substances may not be the equivalent of breaking into a facility to maliciously discharge such substances, but it implies a greater degree of control than just contracting for vessels to make deliveries. Though it is an open question whether Waukegan ultimately will be able to establish operator liability under this theory, its allegations are sufficient to permit its operator claim to survive a motion to dismiss. The cases cited in the common motion to the contrary are distinguishable. *See, e.g.*, *United States v. Qwest Corp.*, 353 F. Supp. 2d 1048, 1051-52 (D. Minn. 2005) (granting motion to dismiss operator claims where defendant performed work outside of the alleged facility, had no control over the facility, and was unaware that the facility existed); *Redevelopment Agency of Stockton v. Burlington N. & Santa Fe Ry. Corp.*, No. S-05-02087, 2007 WL 1793755, at *5 (E.D. Cal. June 19, 2007) (railroad company found not to be an operator where it was not aware of and did not maintain a drain pipe that served as a conduit for hazardous material).

Waukegan's third operator claim against National Gypsum is based on the dredging of a portion of the harbor that was proposed by National Gypsum and the LaFarge Defendants in 2000 and that took place sometime later. Allegedly, this activity caused a further release of PCBs by spreading and redistributing them within the Facility. Defendants correctly point out that the complaint does not allege who specifically performed the work that caused this alleged release. It is possible that, if the work was performed by a contractor, National Gypsum would not be liable as an operator. This determination, however, requires an examination of the facts that is more appropriately done at either summary judgment or trial. Waukegan has alleged

that National Gypsum was responsible for dredging activities that caused a release of PCB-contaminated sediment within the Facility, and those allegations are sufficient under a notice pleading standard to state a claim for operator liability under CERCLA.

Last, Waukegan alleges operator liability against National Gypsum by claiming that, "as part of [National] Gypsum's normal business operations, it . . . is responsible for the maintenance of all lands under water lying within its leased premises, as well as lands under water leading to and adjoining such boundaries . . . ." 2d Am. Compl. ¶ 83. If proven, this allegation could lead to a finding that National Gypsum "directs the workings of, manages, or conducts the affairs" of the Facility (or a portion of it). *Bestfoods*, 524 U.S. at 66-67. Accordingly, Waukegan may also maintain its operator claim against National Gypsum based on this allegation.

### iii. Causation

National Gypsum next argues that the complaint should be dismissed because it does not adequately plead causation. As the common motion points out, a plaintiff in a CERCLA action must prove that the release of a hazardous substance by an appropriate defendant caused that plaintiff to incur response costs. *See Krygoski Constr. Co. v. City of Menominee*, 431 F. Supp. 2d 755, 763 (W.D. Mich. 2006). Waukegan alleges that the release of PCBs in the Facility "have caused the City to incur 'response costs' within the meaning and scope of CERCLA. . . . The City has incurred, and will continue to incur, response costs in connection with the investigation of the PCBs at the Facility and potential remedial actions. . . ." 2d Am. Compl. ¶¶ 94-95. These allegations, under a notice pleading standard, are sufficient to state a

CERCLA claim.

The cases defendants cite in the common motion do not support their contention that Waukegan has failed to allege causation sufficiently. First, most of those cases dealt with a plaintiff's failure to present evidence of causation at summary judgment – not failure to plead causation. *See Krygoski Constr. Co.*, 431 F. Supp. 2d at 757, 763; *Rhodes v. County of Darlington*, 833 F. Supp. 1163, 1167, 1191-92 (D.S.C. 1992); *see also Young v. United States*, 394 F.3d 858, 864 (10th Cir. 2005) (holding summary judgment appropriate because of absence of proof of response costs where property remained contaminated and plaintiffs did not intend to cleanup property in the future).

Defendants also rely on *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39 (6th Cir. 1988), in which dismissal of a CERCLA claim pursuant to Rule 12(b)(6) was held appropriate because the plaintiffs had not alleged causation. That case is distinguishable. There, the plaintiffs, individuals and a putative class of similarly situated individuals, alleged with specificity the response costs incurred by various governmental agencies but made no such allegations regarding their own response costs. *Id.* at 42-43. Thus, the plaintiffs had alleged specific facts on the same point regarding others but left a telling silence with respect to their own response costs. The *McGregor* court, however, did not hold that a CERCLA plaintiff must always identify its specific response costs in its complaint.[4] *Id.* Under the notice pleading standard, Waukegan has sufficiently alleged response costs and causation.

---

[4]To the extent another case cited by defendants, *General Cable Industries, Inc. v. Zurn Pex, Inc.*, 561 F. Supp. 2d 653 (E.D. Tex. 2006), implies such a rule, the Court declines to follow that decision.

### iv.    Old Gypsum's bankruptcy

National Gypsum also argues Waukegan's claims against it should be dismissed based on the bankruptcy discharge that Old Gypsum received in 1993.  Essentially, National Gypsum contends that Waukegan is improperly attempting to assert claims against it based on actions taken by Old Gypsum.

Following a discharge in bankruptcy, it is inappropriate for a plaintiff to assert a CERCLA claim against a successor to the discharged entity based on conduct for which a claim could have been made in the bankruptcy.  *See In re Chicago Milwaukee St. Paul & Pac. Ry. Co.*, 3 F.3d 200, 202-03 (7th Cir. 1993).  This rule is merely an application of the general principle that bankruptcy provides a fresh start free from pre-bankruptcy claims.  *See In re Duke*, 79 F.3d 43, 44 (7th Cir. 1996) (noting that "bankruptcy is normally viewed as a process through which a debtor obtains relief from pre-petition obligations and gets a fresh start").  Despite these undisputed legal propositions, National Gypsum's argument regarding Old Gypsum's bankruptcy fails. Waukegan is not seeking to impose liability on National Gypsum for Old Gypsum's pre-bankruptcy obligations.  Rather, Waukegan's claims are based on (1) National Gypsum's alleged ownership of a portion of the Facility from 1993 through the present; and (2) National Gypsum's alleged operation of a portion of the Facility after 1993. Property owners are subject to strict liability under CERCLA.  *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 783 (7th Cir. 2000).  National Gypsum's alleged actions as an operator, including the 2000-dredging project, also occurred after Old Gypsum was discharged.

17

Waukegan's complaint contains various allegations regarding activity by Old Gypsum in the harbor going back to the 1950s. Those allegations are, presumably, not the basis for operator liability; rather, they provide history and context regarding the harbor and establish Old Gypsum's ownership, which was subsequently passed on to National Gypsum. Waukegan may not pursue an operator claim against National Gypsum based on activities conducted by Old Gypsum. But Old Gypsum's bankruptcy has no affect on the CERCLA claims Waukegan asserts in the complaint.

### b. The LaFarge Defendants

Waukegan has also asserted claims for both owner and operator liability under CERCLA against the LaFarge Defendants. For the same reasons discussed with respect to National Gypsum, Waukegan has stated a claim for operator liability against the LaFarge Defendants based on their alleged conduct with respect to the dredging of the submerged land under the harbor. Waukegan has also stated a claim against LaFarge based on vessel ownership. The remainder of the operator allegations against the LaFarge Defendants, based on prop wash, fail to state a claim.

Waukegan's complaint does not, however, state a claim for owner liability under CERCLA against LaFarge. The main reason is that, even though LaFarge has entered into a long-term contract with the Port District, LaFarge does not lease any land or property going up to the edge of the shoreline. Instead, its leased property ends approximately fifty feet from the harbor and the lake. Even though a long-term lessee can be an owner for CERCLA purposes, that rule would not impose owner liability on LaFarge because it does not lease or own either submerged lands or property on the

shoreline.  Similarly, Waukegan has not made allegations against LBM that would support an owner liability claim.

The contract between LaFarge and the Port District grants LaFarge an "easement, license, privilege and permit" to construct and operate conveyors on the fifty-foot strip of land leading to the harbor docks and for its employees to cross that strip.  2d Am. Compl. Ex. Y ¶ 13.  That contract also grants LaFarge the nonexclusive right to use portions of the harbor dock upon giving the Port District forty-eight hours notice.  It does not, however, require LaFarge to "maintain the said dock in good condition" – that obligation belongs to the Port District.  *Id.* ¶ 10.  Nor does LaFarge actually lease the land containing the easement or the harbor.

"A license in respect of real property . . . is permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land . . . .  [A]n easement is a privilege in land existing distinct from ownership of the land."  *Mueller v. Keller*, 18 Ill. 2d 334, 340, 164 N.E.2d 32 (1960) (citations omitted).  Based on this principle, the Ninth Circuit found that an easement holder was not an "owner" for purposes of CERCLA.  *See Long Beach Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust*, 32 F.3d 1364, 1368-69 (9th Cir. 1994).  The fact that LaFarge holds an easement to cross the land leading to the harbor and a license to use, on a nonexclusive basis, a portion of the harbor does not transform it into a lessee, much

less an owner, of that property.[5]  Accordingly, the Court dismisses Waukegan's CERCLA claim based on owner liability against the LaFarge Defendants.

### c.    St. Mary's

Waukegan has failed to state a claim against St. Mary's for operator liability under CERCLA.  As detailed above and in the Court's April 7, 2008 decision, causing someone else's vessels to enter the harbor as part of regular business activities is not enough to impose operator liability against St. Mary's.  Unlike National Gypsum and the LaFarge Defendants, Waukegan does not make any additional allegations against St. Mary's that could form the basis for operator liability.

Waukegan likewise has failed to state a claim for owner liability against St. Mary's.  Similar to the owner liability allegations against the LaFarge Defendants, Waukegan has not alleged that St. Mary's is the owner or lessee of land adjacent to the shoreline, submerged lands, or the harbor itself.  The complaint includes as an exhibit a contract between St. Mary's predecessor and the Port District.  That contract only grants St. Mary's an easement to cross land leading up to the harbor dock and a license to use the harbor dock.  For the same reasons discussed with respect to LaFarge, the contract between St. Mary's and the Port District for an easement and license is not enough to make St. Mary's an owner for CERCLA purposes.

---

[5]Waukegan argues that LaFarge is a lessee and an owner because the easement and license to use the harbor docks are an integral and important part of the contract.  Though it is undoubtedly true that without the easement and dock usage rights LaFarge would not have leased any land from the Port District, Waukegan does not explain why or offer any authority in support of its contention that this fact transforms LaFarge into a lessee and *de facto* owner for CERCLA purposes.

## 2.      IWPDA claims

The IWPDA prohibits the "discharge" of oil or "other pollutants" directly or indirectly into the waters of Illinois and authorizes any governmental body having such waters within its territorial limits to arrange for the pollutants' removal.  415 ILCS 25/3, 4.  "'Discharge' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping," and the term "other pollutants" is defined to mean "any floating materials which may cause unsightly appearance on the surface of such waters or are detrimental to aquatic life or the water quality of such waters"  *Id.* 25/2(b)-(c). Liability is imposed on owners and operators.  *Id.* 25/5.  The statutory definition of the term "owner or operator," like that contained in CERCLA, is not particularly illuminating; the IWPDA says that this term "means any person owning or operating any facility." *Id.* 25/2(h).  But there is no basis to believe that this term has a meaning that differs from that which applies under CERCLA.

Given these similarities, Waukegan has stated claims under the IWPDA to the same extent it has stated claims under CERCLA.  In other words, Waukegan has stated claims under the IWPDA against National Gypsum for owner liability and against National Gypsum and the LaFarge Defendants for operator liability consistent with the preceding discussion.  The IWPDA claims against St. Mary's are dismissed.

The defendants also argue that CERCLA preempts the IWPDA claims. CERCLA preempts state-law actions only to the extent that the state-law action would "provide compensation for the same removal costs or damages" as a corresponding CERCLA action.  42 U.S.C. § 9614(b); *Ashtabula River Corp. Group II v. Conrail, Inc.*,

549 F. Supp. 2d 981, 985-86 (N.D. Ohio 2008). The IWPDA and CERCLA do not necessarily provide "for the same removal costs or damages." First, the IWPDA provides for recovery of attorney's fees – CERCLA does not. Second, it is possible that some of the remediation costs Waukegan allegedly incurred could be recoverable under the IWPDA but not CERCLA. For example, response costs can only be recovered under CERCLA to the extent they are consistent with the NCP. 42 U.S.C. § 9607(a)(4). The IWPDA does not contain such a limitation. 415 ILCS 25/5. Because the two claims potentially seek recovery for non-overlapping costs, the Court declines to dismiss the IWPDA claim. *See New York v. Ametek, Inc.*, 473 F. Supp. 2d 432, 433-34 (S.D.N.Y. 2007). It may be necessary to address this point again later, once evidence regarding damages has been made part of the record.

### Conclusion

For the reasons stated above, the Court grants the motion to dismiss filed by defendant St. Mary's [docket no.119]. The Court grants the common motion to dismiss with respect to operator liability based on prop wash but otherwise denies that motion [docket no. 125]. National Gypsum's individual motion is denied [docket no. 117]. The LaFarge Defendants' motion is granted with respect to owner liability but is otherwise denied [docket no. 123]. In sum, Waukegan may maintain claims pursuant to CERCLA and the IWPDA against National Gypsum for owner liability and operator liability based on dredging activities, ownership and operation of vessels, and maintenance of the Facility and against LaFarge and LBM for operator liability based on dredging activities and ownership of vessels. National Gypsum, LaFarge, and LBM are directed to answer the remaining claims by December 8, 2008. This matter is set for

22

status hearing on December 15, 2008 at 9:30 a.m.  Counsel are directed to confer prior

to that date to develop a proposed schedule for discovery.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 24, 2008